IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | ) | CRIMINAL NO. 16-27 |
| | ) | |
| | ) | CHIEF JUDGE JOY FLOWERS CONTI |
| | ) | |
| vs. | ) | |
| | ) | |
| **ANDREW M. JONES,** | ) | |
| | ) | |
| Defendant, | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

CONTI, Chief District Judge.

I.      Introduction

Defendant Andrew Jones ("Jones") filed a motion to suppress evidence (ECF No. 33). The government filed a response in opposition to the motion. On January 5, 2017, the court held an evidentiary hearing. The parties were permitted to file proposed findings of fact and conclusions of law. The parties filed those post-hearing submissions on March 1, 2017. The motion is ripe for disposition.

II.     Factual and Procedural Background

Jones is charged in a one-count indictment at Criminal Number 16-27 with possession of a firearm and ammunition by a convicted felon on January 31, 2016, in violation of 18 U.S.C. §922 (g) (1). In his suppression motion, Jones argues that law enforcement agents violated his Fourth Amendment rights by subjecting him to an unlawful traffic stop without reasonable suspicion. Jones argues that his subsequent arrest was without probable cause and did not fall within any exception to the Fourth Amendment's warrant requirement. Jones claims, therefore, that the search of his vehicle was not incident to a legal arrest. He seeks to suppress evidence

gathered during the search of the vehicle, in particular, the firearm that officers recovered from the vehicle. Jones' motion also sought to suppress any statements made by him as fruits of the illegal arrest, but counsel clarified that he was challenging only the stop and search of the vehicle. (Transcript, ECF No. 55 at 12).[1]

Findings of Fact

1. Jones and Pittsburgh Police Officer Gino Macioce ("Macioce") testified at the hearing. Other than with respect to testimony about Jones' leaning in an effort to conceal something, Macioce offered credible testimony regarding the events that transpired on the evening of January 31, 2016. Jones testified credibly regarding his temporary use of the vehicle. The government submitted two exhibits, a dashboard camera ("dashcam") video of the encounter (Govt. Ex. 1) and four reports prepared by officers after the incident (Govt. Ex. 2).

2. Jones obtained permission to borrow his cousin's vehicle to drive to his girlfriend's house approximately four or five hours before the incident. (T. 18). He had not previously borrowed the car. (T. 18).

3. On the night of January 31, 2016, Macioce and his partner Robert Connors ("Connors") were patrolling the Zone 5 area of Pittsburgh, Pennsylvania, near the 7300 block of Bennett Street in Homewood in a marked police vehicle. (T. 24-25).

4. Around 2:50 a.m., the officers observed a silver Nissan Altima stop at a stop sign, proceed, and "abruptly" stop again mid-block. (T. 26, 35).

5. The driver accelerated at an unusually high rate of speed, seemingly exceeding the 25 miles per hour limit. (T. 35).

6. Macioce observed the vehicle cross the double center line "two to three times" for "two to

---

[1] References to the transcript of the evidentiary hearing will be cited as "(T. __)."

three seconds at a time," almost striking an oncoming vehicle. (T. 26). He also observed that the vehicle abruptly started and stopped and was not smoothly driven. (T. 26). The vehicle did not maintain a safe distance from the car in front of it. (T. 27). Most of these violations were not captured on the dashcam video, which only began recording thirty seconds prior to activating the lights, which was a standard function of the software. (T. 26-28).

7. As the officers continued to follow the vehicle, they observed that the center brake light was inoperable (T. 26).

8. Macioce believed at the time that the inoperable center brake light was a violation of the general lighting requirements of the Pennsylvania Motor Vehicle Code. (T. 27, 31).

9. According to Macioce, the "very quick braking," the "very quick accelerating," the "swaying and going over the line," suggested, cumulatively, that the driver was possibly intoxicated. (T. 37).

10. The officers activated the police lights when the vehicle driven by Jones and another vehicle pulled into the parking lot of the Greater Pittsburgh Coliseum. (T. 33-34).

11. Macioce testified that he observed Jones lean over toward the right side of the vehicle, which he interpreted as an act of concealment. (T. 34, 38). The "lean" is not visible on the dashcam video and the court in not able to credit the testimony of Macioce with respect to the lean. In light of the observations about the erratic driving and the vehicle being turned by Jones into a parking lot, the court concludes that Macioce had a mistaken belief about observing the lean. Under the circumstances, the court does not consider his testimony about that belief to be a deliberate falsehood and will not consider that the mistake tainted his other observations.

12. After the two cars parked, Macioce approached the passenger side of the vehicle driven by

Jones with a flashlight in hand and his gun in the holster. (T. 38-39).

13. Connors simultaneously approached the driver's side of the vehicle with his gun in the holster. (T. 39).[2]

14. When Macioce illuminated the backseat of the vehicle with his flashlight, he saw a gun on the floorboard, directly behind the passenger seat. (T. 38-39, dashcam video).

15. Immediately thereafter, Macioce can be heard on the dashcam video exclaiming, "gun, gun." Both officers drew their weapons and ordered Jones to remain in place. (T. 39, dashcam video).

16. Jones was ordered to keep his hands on the steering wheel and to step slowly out of the vehicle while showing his hands. (dashcam video).

17. The officers handcuffed Jones and frisked his person. (dashcam video).

18. Jones informed the officers that the car he was driving was his cousin's vehicle. (T. 18). The officers contacted the vehicle's owner, who confirmed that Jones had permission to drive it. (T. 49, dashcam video).

19. Officers retrieved a firearm from the floorboard behind the passenger seat. (T.39, dashcam video).

20. Officers checked Jones' identification and informed him they were going to investigate the gun in the car. (dashcam video).

21. Macioce administered a field sobriety test to Jones at the scene. (T. 42-43).

22. During the course of the field sobriety evaluation, Macioce observed what he called a "vertical gaze nystagmus," or the "involuntary jerking of the eyes," which led him to

---

[2] Connors interacted with the driver of the first vehicle and told her that she was free to leave. (T. 48).

conclude that Jones was "highly intoxicated." (T. 43-44). Macioce completed an Officer Impairment Report in which he reported his observations about Jones, including a strong odor of alcohol, confused and slurred speech, glassy and watery eyes, combative, insulting, profane and talkative speech, wobbling, swaying and needing support for balance, swaying while walking and turning and poor ability to follow instructions. (Govt. Ex. 2). In the report, Macioce noted that Jones refused a breath test and concluded that Jones was impaired. (Govt. Ex. 2).

23. Pittsburgh Police Officer Glenn Aldridge ("Aldridge") was also at the scene and completed an "Observer Impairment Report," in which he indicated that a strong odor of alcohol emanated from Jones's breath, his speech was slurred and his eyes were bloodshot and glassy. Aldridge indicated in the report that Jones was combative, his impairment was obvious and he was unfit to operate a motor vehicle. (T. 44-45, Govt. Ex. 2).

24. Jones did not produce a permit to possess the firearm. While at the scene, one of the officers informed Jones that he was being arrested for the "stolen gun that's in your car and DUI." (dashcam video at 3:00.42).

25. Jones was arrested for driving under the influence and firearm offenses and transported to Zone 6, the special deployment division. (T. 40, Govt. Ex. 2).

## Conclusions of Law

1. Jones argues that the decision to stop his vehicle was not based upon a valid traffic violation and was without reasonable suspicion. He argues that his subsequent arrest was without probable cause and that the search of the vehicle incident to the arrest was in violation of his rights under the Fourth Amendment to the United States Constitution. He contends that the

firearm should not be admitted into evidence. The government contends, as a threshold issue, that Jones lacks standing to challenge the search of the vehicle.

A. **Jones has standing to challenge the search**

2. Jones has the initial burden to show that he has a reasonable expectation of privacy in the property searched. *United States v. Baker*, 221 F.3d 438, 441 (3d Cir. 2000). The court must perform a fact-bound inquiry to assess: (1) the strength of the driver's interest in the car; and (2) the nature of his control over it. *Id.* Ownership is not necessary. *Id.* In *Baker*, the court of appeals held that a driver who had borrowed a car from a friend and driven it for four to six weeks had standing to challenge a search of the car. *Id.* at 442. The court endorsed the principle that "if an individual has the owner's permission to use property, society surely recognizes this as reasonable." *Id.* at 443 (citing *United States v. Garcia*, 897 F.2d 1413, 1418-19 (7th Cir. 1990) (if the driver of a vehicle has the owner's permission to use it, "society surely recognizes this as reasonable"); *accord United States v. Miller*, 821 F.2d 546 (11th Cir. 1987) (sole occupant of car borrowed from a friend has standing to challenge search of the borrowed car); *United States v. Williams*, 714 F.2d 777, 779 n. 1 (8th Cir. 1983) (defendant who occasionally borrowed the vehicle from the owner and obtained permission to use it on the day the vehicle was searched had standing to challenge search).

3. In *United States v. Howard*, 210 F. Supp.2d 503, 511-12 (D. Del. 2002), the court held that the defendant had standing to challenge the search of his girlfriend's car where he approached the car alone, had the keys, and had permission to access the vehicle, even though he did not have permission to drive it. The court explained that there is "a substantial difference between a person who exceeds their rights to a borrowed car and a person who steals a car." *Id.* at 512.

4. The government argues that Jones lacks standing because he borrowed the car on only one occasion for a few hours, but the decisions the government cited do not support that proposition. In *United States ex rel. Laws v. Yeager*, 448 F.2d 74, 85 (3d Cir. 1971), defense counsel objected at trial to the admission into evidence of objects found in an automobile on the ground that it had not been shown that the automobile belonged to Laws. Laws took the stand and testified that he had nothing to do with the robbery and that the automobile belonged to a friend, although he borrowed the car on occasion. *Id*. On appeal, the defendant completely changed his position and presented the "unique theory that he, using the automobile for the purposes of the robbery, made it his own and therefore he can rely on the Fourth and Fifth Amendments to exclude from evidence the objects contained in the automobile." *Id*. The court held that "**under the circumstances of this case** he does not have the standing to invoke these constitutional rights. *Id*. (emphasis added). The *Yeager* case did not address the general principles which govern standing to challenge searches of borrowed vehicles. In *Baker*, the court cited *Yeager* for the proposition that a defendant who stole a car and used it in a robbery lacked standing and then stated: "We have never considered, however, whether an individual who borrows a car and has control over it has a legitimate expectation of privacy in it." 221 F.3d at 442. The only other decision cited by the government, *United States v. Jimenez*, 789 F.2d 167, 170 (2d Cir. 1986), is not on point because it involves occasional access to an apartment, not a vehicle.

5. Standing requires a fact-bound inquiry. In this case, Jones was the sole occupant of the car, obtained possession of the car by consent from his cousin, exercised exclusive control over the vehicle for several hours, and there was no evidence that the car was stolen. The court finds that Jones has standing to challenge the search of the vehicle.

7

## B. The Pittsburgh Police Officers had reasonable suspicion to stop Jones

6. The Fourth Amendment protects the public from "unreasonable searches and seizures." U.S. Const. amend. IV.

7. The government must prove, by a preponderance of the evidence, that "each individual act constituting a search or seizure under the Fourth Amendment was reasonable." *See United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005). Evidence obtained from an investigatory stop made without reasonable suspicion must be suppressed as "fruit of the poisonous tree." *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006) (quoting *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963)).

8. The basic premise of the search and seizure doctrine is that searches undertaken without judicial oversight and a warrant issued upon probable cause are "per se unreasonable," subject only to a few specifically established exceptions. *Katz v. United States*, 389 U.S. 347, 357 (1967). The Supreme Court established one such exception in *Terry v. Ohio*, 392 U.S. 1, 30 (1968), holding that a police officer may conduct a brief, investigatory stop when the officer, accounting for his professional experience, has a reasonable, articulable suspicion that criminal activity may be afoot. The reasonable suspicion standard delineated in *Terry* applies equally to routine traffic stops. *United States v. Delfin-Colina*, 464 F.3d 392, 397 (3d Cir. 2006).

9. Although the Supreme Court has not specifically defined the phrase "reasonable suspicion," the "essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account." *United States v. Cortez*, 449 U.S. 411, 417 (1981). Officers must have a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.* at 417-18. Even seemingly innocent factors, when viewed

8

together, can amount to reasonable suspicion. *United States v. Foster*, 824 F.3d 84, 89 (4th Cir. 2016).

10. Stopping an automobile based upon at least articulable and reasonable suspicion that either a vehicle or an occupant is in violation of the law is not unreasonable under the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 663 (1979). In fact, the foremost method for police officers to enforce traffic and vehicle safety regulations is by acting upon those observed violations. *Id.* at 659.

11. Clearly, a police officer who observes a violation of state traffic laws may lawfully stop the car committing the violation. *United States v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004). Erratic driving, weaving, or crossing the double yellow center line may supply an officer with the requisite suspicion to initiate a traffic stop. *See United States v. Seigler*, 484 F. App'x 650, 653 (3d Cir. 2012). When a police officer has reasonable suspicion of a vehicle equipment violation, conducting a traffic stop of the defendant's vehicle is not in violation of the Fourth Amendment. *See United States v. Hall*, 270 F. App'x 123 (3d Cir. 2008).

12. Reasonable suspicion can be based even upon an officer's mistaken understanding or knowledge of the state's applicable traffic laws. *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014).

13. The following observations, when viewed cumulatively, supplied Macioce and Connors with the requisite reasonable suspicion to initiate a traffic stop on the car driven by Jones:

    a. they observed the silver Nissan Altima driven by Jones stop at a stop sign, proceed, and "abruptly" stop again mid-block (T.26, T.35), before accelerating at an unusually high rate of speed (T. 35);

    b. Macioce observed the vehicle appearing to cross the double centerlines "two to

9

three times" for "two to three seconds at a time," almost striking an oncoming vehicle (T. 25-26); *see Seigler,* 484 F. App'x at 653 (weaving within the lane and crossing the double yellow center line three times within the span of a mile created reasonable suspicion that the operator of a vehicle was driving under the influence).

    c. Macioce observed the "very quick braking," the "very quick accelerating," the "swaying and going over the line," suggesting that the driver was possibly intoxicated (T. 37); and

    d. Macioce observed that the center brake light was inoperable. (T. 26).

14. The dashcam video confirms that the center brake light was not illuminated. The court credits Macioce's testimony regarding the erratic driving, although it could not confirm it from the dashcam video. Jones' driving of the car was only automatically recorded for thirty seconds before the lights were activated, which was just before Jones turned the car he was driving into the parking lot. Most of the erratic driving took place before the lights were activated. In any event, the traffic stop was permissible solely based upon the inoperable center brake light.

15. In *United States v. Jones*, 506 F. App'x 128 (3d Cir. 2012), the court held that an inoperable center brake light provided reasonable suspicion to stop a vehicle for violation of Pennsylvania's traffic laws. *Id.* at 131-32. *Jones*, while nonprecedential, is factually similar and persuasive authority.

16. Under Pennsylvania law, every vehicle operated on a highway shall be equipped with a rear lighting system including, but not limited to, rear lamps, rear reflectors, stop lamps and license plate light, in conformance with regulations of the department. 75 Pa. Cons. Stat.

§4303(b); *Jones*, 506 F. App'x at 131-32.

17. Although a center-mounted brake light is not required equipment under the Pennsylvania motor vehicle code and regulations, if it is originally equipped or installed, then it must properly operate. 67 Pa. Code § 175.80(a)(9)(i); *Jones*, 506 F. App'x at 131-32. In *Pennsylvania v. Muhammed*, 992 A.2d 897, 902-03 (Pa. Super. Ct. 2010), the court held that failure of a center brake light to illuminate provided reasonable suspicion of a motor vehicle code violation. *See Jones*, 506 F. App'x at 131-32.

18. Even if Macioce incorrectly believed that an inoperable center brake light was a violation of the Pennsylvania motor vehicle code, a police officer's mistake, if reasonable, would not invalidate the traffic stop. *See Heien*, 135 S. Ct. at 536 (police officer's mistaken belief that a vehicle had to have two working brake lights, when in fact only one was required by law, was reasonable and thus did not invalidate the traffic stop).

C. **Macioce lawfully observed the firearm.**

19. It is well settled that an individual has no legitimate expectation of privacy in that portion of the interior of an automobile which may be viewed from outside of the vehicle by either inquisitive passersby or diligent police officers. *Texas v. Brown*, 460 U.S. 730, 740 (1983).

20. The use of "artificial means," like a flashlight, to illuminate the darkened areas of the vehicle does not constitute a search within the meaning of the Fourth Amendment. *Id.*; *accord Jones*, 506 F. App'x at 132.

21. "Any weapons found in plain view during a traffic stop may be seized." *Jones*, 506 F. App'x at 132 (citations omitted).

22. Macioce and Connors initiated a valid traffic stop and were lawfully entitled to approach the vehicle. Macioce routinely used a flashlight to enable him to "see when it's dark out." (T.

38-39). The officers' weapons were holstered as they approached the vehicle.

23. When Macioce used the flashlight to illuminate the backseat of the vehicle, he saw a firearm in plain view through the window. (T. 39). Immediately thereafter, Macioce can be heard on the police dashcam video exclaiming "gun, gun!" (dashcam video). The officers acted reasonably in immediately drawing their weapons.

24. Jones had no legitimate expectation of privacy in this interior portion of the vehicle he was driving, namely the floorboard of the rear passenger compartment, which could be viewed from outside the vehicle, through the window, by a police officer utilizing a routine procedure to illuminate the darkened areas of the vehicle during a lawful traffic stop. *Brown*, 460 U.S. at 740; *Jones*, 506 F. App'x at 132.

**D.** **It was reasonable for Macioce and Connors to order Jones out of the vehicle, handcuff him, and frisk his person while the scene was secured.**

25. Upon a lawful traffic stop, a police officer has the authority and duty to control the vehicle and its occupants for a brief period of time. *Bonner*, 363 F.3d at 217.

26. In addition to instructing the driver to exit the vehicle, police officers may take other steps that are "reasonably necessary to protect their personal safety and to maintain the status quo during the stop." *United States v. Edwards*, 53 F.3d 616, 619 (3d Cir. 1995) (citing *United States v. Hensley*, 469 U.S. 221, 235 (1985)); *accord Pennsylvania v. Mimms*, 434 U.S. 106, 111-12 (1977); *United States v. McMillan*, No. 2:16-CR-00045-1, 2017 WL 44862, at *3 (W.D. Pa. Jan. 4, 2017).

27. If an officer has reasonable suspicion that an occupant in a vehicle is armed and dangerous, it would not be unreasonable for him to draw his weapon, order the occupant out of the vehicle and handcuff him until the scene is secured. *United States v. Johnson*, 592 F.3d 442, 453 (3d Cir. 2010).

12

28. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *McMillan*, 2017 WL 44862, at *4.

29. After Macioce observed a firearm on the floorboard of the passenger compartment within reach of Jones, it was reasonable and appropriate for the officers to draw their weapons, instruct Jones to place his hands on the steering wheel, order him to exit the vehicle, frisk his person for additional weapons, and place him in handcuffs to neutralize a situation of potential danger. *Jones*, 506 F. App'x at 132-33; *McMillan*, 2017 WL 44862, at *4.

30. Observation of the firearm in the vehicle, combined with the suspicion that Jones was driving under the influence, provided reasonable suspicion that Jones could be armed, dangerous, or otherwise pose a threat to officer safety.

31. In summary, it was permissible for Macioce and Connors to secure the scene by ordering Jones out of the vehicle and handcuffing him to ensure officer safety and maintain the status quo during the stop.

32. Those actions did not turn the traffic stop into an "arrest." *Jones*, 506 F. App'x at 132-33 (citing *Bonner*, 363 F.3d at 216-17; *Baker v. Monroe Twp.*, 50 F.3d 1186, 1193 (3d Cir. 1995) (there is no per se rule that pointing guns at people or handcuffing them constitutes an arrest, but the "use of guns and handcuffs must be justified by the circumstances.")).

**E.** **Macioce and Connors lawfully retrieved the firearm from the passenger compartment of the vehicle.**

33. The protection of police officers can justify protective searches when there is a reasonable belief that the suspect poses a danger. *Michigan v. Long*, 463 U.S. 1032, 1049, (1983).

34. Roadside encounters between police officers and suspects are especially hazardous and danger may arise from the possible presence of weapons in the area surrounding a suspect.

13

*Id*.

35. A search of the passenger compartment of an automobile is permissible if the police officers have a reasonable belief that the suspect is dangerous and could gain immediate control of a weapon. *McMillan*, 2017 WL 44862, at *4 (quoting *Long*, 463 U.S. at 1049.

36. The search must be limited to those areas in which a weapon may be placed or hidden. *Id*.

37. Even if the defendant is effectively under the officers' control, prior to a full custodial arrest, it is still reasonable for an officer to search the passenger compartment of the vehicle for weapons in part because the defendant could be allowed back into the vehicle if a full custodial arrest is not effected. *Id*.; *accord Long*, 463 U.S. at 1051-52.

38. Although Jones had been detained and was technically under the officers' control while the scene was being secured, there was no indication that a full custodial arrest would be effected until after he failed the field sobriety test. Therefore, an officer could reasonably believe after observing a gun in the back seat of a car that the suspect might regain control of that weapon or any other weapon, possibly concealed or hidden, in the event that a full custodial arrest was not effectuated and Jones was permitted to return to the vehicle.

39. Jones did not produce a permit to carry the firearm, and officers learned that the gun was stolen, which contributed to the officer's reasonable belief that he could pose a danger to officer safety.

40. The retrieval of the firearm was a product of a lawful search of the passenger compartment of the vehicle and was permissible to ensure officer safety.

41. Because the court concludes that the officers did not violate the Fourth Amendment during the events leading up to and including the retrieval of the firearm, the firearm will not be suppressed.

42. Officers had probable cause to arrest Jones and charge him with driving under the influence and firearms offenses.

43. After careful consideration of the record and relevant legal authorities, the court concludes that Jones has standing, but the government proved by a preponderance of the evidence that the officers had reasonable suspicion to stop the vehicle, officers lawfully observed the gun in the vehicle, Jones was properly secured for officer safety, the loaded firearm was lawfully retrieved from the vehicle, and there was probable cause to arrest Jones.

44. In accordance with the foregoing, the motion to suppress evidence will be DENIED. An appropriate order will be entered.

March 31, 2017

BY THE COURT:

/s/ *Joy Flowers Conti*
Joy Flowers Conti
Chief United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | ) | CRIMINAL NO. 16-27 |
| | ) | |
| | ) | CHIEF JUDGE JOY FLOWERS CONTI |
| | ) | |
| vs. | ) | |
| | ) | |
| **ANDREW M. JONES,** | ) | |
| | ) | |
| Defendant, | ) | |

## **ORDER**

AND NOW, this 31st day of March, 2017, for the reasons set forth in the accompanying Findings of Fact and Conclusions of Law, IT IS HEREBY ORDERED that the motion to suppress evidence filed by defendant Andrew M. Jones (ECF No. 33) is **DENIED**.

A status conference is scheduled for April 4, 2017 at 2:30 p.m., to set a trial date as the Speedy Trial clock is now running.

BY THE COURT:

/s/ Joy Flowers Conti
Joy Flowers Conti
Chief United States District Judge